**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **SYLVIA E. BRANCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 6336** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Sylvia E. Branch ("Branch") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner") denying her application

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.[1] Branch has

filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

seeking a judgement reversing or remanding the Commissioner's final decision. The Commissioner

has filed a cross-motion for summary judgment and requests that we affirm his final decision. For

the reasons set forth below, Branch's motion for summary judgment is granted [dkt. 19] and the

Commissioner's motion for summary judgment is denied [dkt. 24].

**I.      Procedural History**

On January 4, 2007, Branch filed an application for SSI, alleging that she had been disabled

since February 12, 2007.[2] That claim was denied on February 7, 2007.[3] Upon reconsideration,

---

[1] *See* 42 U.S.C. §§ 405(g), 1382 *et seq.*
[2] R. at 126-130.
[3] R. at 66.

Branch's claim was again denied by notice dated June 7, 2007.[4]  Thereafter, Branch filed a request for a hearing before an Administrative Law Judge ("ALJ").[5]

On April 27, 2009, an administrative video hearing was held before ALJ Mona Ahmed, with the ALJ seated in Orland Park, Illinois and Branch located in Gary, Indiana.[6]  Following the hearing, the ALJ issued an unfavorable opinion dated August 17, 2009, finding that Branch was not disabled under the Social Security Act.[7]  Branch then filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council.[8]  On July 30, 2010, the Appeals Council denied the request for review, making the ALJ's August 17, 2009 decision the final administrative determination of the Commissioner.[9]  On October 4, 2010, Branch filed this action.[10]

## II.    Medical Evidence

Medical evidence in the record documents that Branch received treatment for physical injuries - including back and shoulder pain -  and depression.  We will briefly summarize the medical evidence related to these conditions as it pertains to the cross-motions for summary judgment.

## A. Physical Injuries

Documents show that Branch complained of back pain dating back to 1991.[11]  In January 2007, Neurosurgeon Geoffrey Dixon, M.D. performed an L5-S1 laminectomy and L4-S1 lumbar

---

[4]R. at 67.
[5]R. at 89-90.
[6]R. at 11, 27-63.
[7]R. at 11-21.
[8]R. at 6.
[9]R. at 1-3.
[10]*See* Comp. [dkt 1].
[11]R. at 420.

interbody fusion with screw instrumentation in an attempt to relieve Branch's back pain.[12] However, at a follow-up exam with Dr. Dixon in January 2007, Branch continued to complain of pain.[13] Branch told Dr. Dixon that her back pain prevented her from sleeping.[14] Dr. Dixon noted that Branch was possibly suffering from muscle spasms.[15] He prescribed Norflex and a sleep medication, and he recommended physical therapy.[16] In March 2007, Branch continued to complain to Dr. Dixon that she had low back pain radiating to her left leg.[17] However, she told Dr. Dixon that she was doing better.[18] In a May 2007 follow-up with Dr. Dixon, Branch again complained of pain, numbness, and tingling in her left leg.[19] Dr. Dixon prescribed anti-inflammatory medication and advised that Branch begin physical therapy immediately.[20]

Subsequently, Branch, underwent physical therapy from September through December 2007.[21] Therapy notes also show that she underwent therapy in February 2008.[22]

On May 30, 2007, the state disability determination service conducted a consultative examination.[23] During that exam, Branch stated that her back pain had worsened since her surgery.[24] To help her walk, she stated that she used a cane that was prescribed by her physician.[25] It was

---

[12]R. at 342-349.
[13]R. at 342.
[14]*Id.*
[15]*Id.*
[16]*Id.*
[17]R. at 475.
[18]*Id.*
[19]R. at 474.
[20]*Id.*
[21]R. at 494-519.
[22]R. at 492-93.
[23]R. at 420-24.
[24]R. at 420.
[25]*Id.*

noted that her spine was tender and her lumbar range of motion was limited.[26]  But she had full range

of motion in all extremities.[27]  It was further noted that she had a limping gate, used a cane, and had

difficulty stooping and squatting.[28]

In February and June 2007, state agency medical consultants reviewed the medical evidence

and made assessments about what activities Branch could complete.[29]  They concluded that Branch

could lift twenty pounds occasionally and ten pounds frequently.[30]  She could stand and walk for

about six hours and sit for six hours in an eight-hour day.[31]  The consultants opined that Branch

could never climb ladders, ropes, or scaffolds.[32] They also concluded that she could occasionally

perform all other postural activities.[33] Finally, the consultants found that Branch did not need a cane

to walk.[34]

In October and November 2007, Branch continued to receive treatment for her back pain and

two additional MRIs were taken of her lumbar area.[35]  MRI reports diagnosed Branch with lumber

spondylolisthesis at L5-S1 but stated that her lumbar area was "otherwise normal."[36]

---

[26]R. at 422.
[27]R. at 423.
[28]*Id.*
[29]R. at 367-74, 426.
[30]*Id.*
[31]*Id.*
[32]*Id.*
[33]*Id.*
[34]*Id.*
[35]R. at 519.
[36]*Id.*

In August 2008, Branch complained of left shoulder pain, so a magnetic resonance imaging test ("MRI") was taken of the area.[37]  It did not show definitive evidence of a rotator cuff tear.[38] However, minimal osteoarthritic changes were present.[39]

## B. Depression

Medical evidence in the record also showed that Branch had a history of depression.  In March 2007, she attended a mental health session at Edgewater Systems for Balanced Living ("Edgewater").[40]  It was noted that she was late to that session because she stated that her ride never came and, therefore, she was forced to walk over a mile to get to the session.[41]  Anxiety was noted and there were problems with her mood and affect.[42]  However, her orientation, appearance, cognition, memory, and concentration were normal.[43]  Weekly therapy was recommended and Cymbalta was prescribed.[44]  Also, she was assigned a global assessment functioning ("GAF") score of 49.[45]  Mental health professionals use the GAF scale to convey an individual's psychological, social, and occupational functioning on a spectrum in which scores between 41-50 indicate serious, 51-60 indicate moderate, and 61-70 indicate mild symptoms.[46]

---

[37]R. at 472.
[38]*Id.*
[39]*Id.*
[40]R. at 375-395.
[41]*Id.*
[42]*Id.*
[43]*Id.*
[44]*Id.*
[45]*Id.*
[46]American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR, 34 (4th ed.2000).

On May 14, 2007, she attended a consultative examination with Raymond Bucur, Ph.D.[47] Dr. Bucur observed that Branch was angry and frustrated.[48] Branch's conversation with Dr. Bucur included "belligerent complaints."[49] Dr. Bucur tested Branch's mental cognition and noted that Branch failed to complete some calculations and answered "I don't know" to many questions.[50] Dr. Bucur also observed that Branch was "reluctantly cooperative" and that she did not put forth a full effort.[51] He ultimately opined that Branch was "obviously quite depressed."and diagnosed Branch with severe major depressive disorder.[52] Dr. Bucur assigned Branch a GAF of 50.[53]

## III. Hearing Testimony

Branch, who was accompanied by an attorney, and Vocational Expert Edward Pagella ("VE") testified at the administrative hearing.

First, Branch testified that she was thirty-nine years old, that she has four children, and that she is not married.[54] She stated that she did not have a drivers license, rarely took the train or bus, and could not walk very far.[55] Branch testified that her only recent job was working as an assistant in a school.[56] But she said she can no longer work because of her back pain.[57] The ALJ asked Branch about earnings records that indicated she had worked as a hair dresser in 1997.[58] However,

---

[47]R. at 395-403.
[48]R. at 399.
[49]Id.
[50]R. at 399-403.
[51]R. at 402.
[52]R. at 403.
[53]Id.
[54]R. at 36-37.
[55]R. at 38-40.
[56]R. at 41.
[57]Id.
[58]R. at 52, 149, 172.

Branch denied that she ever styled hair and stated that these earnings were incorrectly reported because someone else had been using her Social Security Number.[59]

When asked to describe her daily activities, Branch testified that she laid in bed the majority of the day, and would periodically stand on the porch and talk to her neighbors.[60] The remainder of her day was spent with her daughters as they helped her around the house.[61] She might try to cook something to eat.[62] However, she stated that she never did laundry or cleaned the house.[63] Instead, her children completed those chores.[64]

When the ALJ asked Branch why she had so few visits to see a mental health professional, Branch stated that she had other doctor appointments that she must attend instead.[65] As for walking over one mile to attend the therapy session at Edgewater, Branch explained that she did this because she believed that she was on the verge of a nervous breakdown.[66]

Next, the VE testified. First, the ALJ advised the VE to inform her if any of his testimony conflicted with the Dictionary of Occupational Titles ("DOT").[67] Then, the ALJ proceeded to present the VE with hypothetical individuals that had limitations similar to Branch's limitations. The first hypothetical individual could complete the following tasks: lift twenty pounds occasionally and ten pounds frequently; stand and walk for six hours in and eight-hour day; never climb ladders,

---

[59]R. at 52-56.
[60]R. at 42.
[61]*Id.*
[62]*Id.*
[63]R. at 43.
[64]*Id.*
[65]R. at 42.
[66]R. at 50.
[67]R. at 51; The Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, gives detailed physical requirements for a variety of jobs. The Social Security Administration has taken "administrative notice" of the DOT. See 20 C.F.R. § 416.966(d)(1).

ropes, and scaffolds; occasionally climb ramps and stairs; occasional stoop; and never kneel, crouch, or crawl.[68] The VE testified that such limitations would not substantially impact the individual's ability to complete "light" occupations.[69] When asked if a stand/sit option were added, the VE stated that there would be the following jobs available to such an individual in the Indiana/Chicago metropolitan region: 5,200 positions as a hand packer, 6,800 positions as a hand assembler, and 4,200 positions as a hand sorter.[70]

Additionally, the VE testified that if the individual also needed use of a hand held ambulatory aid for walking only, this would "not change" the VE's response.[71] If, however, the device was needed for standing and walking, the VE indicated that the number of jobs available would be limited.[72]

When the individual was limited to sedentary work without needing an ambulatory aid, the VE stated that there would be about 4,400 jobs available to the individual in the Indiana/Chicago metropolitan region.[73] If the individual also needed an ambulatory aid for standing and walking, the VE stated that there would be positions, such as information clerk and ticket taker, available to the individual.[74] However, the VE noted that this part of his testimony conflicted with the DOT.[75]

## IV.    ALJ's Decision

---

[68]R. at 56-57.
[69]R. at 57.
[70]Id.
[71]R. at 58-59.
[72]R. at 58.
[73]Id.
[74]R. at 59.
[75]Id.

In her August 17, 2009 decision, ALJ Ahmed determined that Branch was not disabled as defined in the Social Security Act and, therefore, was not entitled to any SSI.[76]  In reaching this conclusion, the ALJ followed the five-step evaluation process outlined in the Social Security Act regulations (the "regulations").[77]  Under the regulations, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[78]  A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[79]

After explaining the applicable law, ALJ Ahmed began the five step evaluation process.  At step one, ALJ Ahmed found that Branch had not engaged in gainful activity.[80]  Proceeding to step two, she concluded that Branch had two severe impairments: lumbar spondylolisthesis at L5-S1, status post laminectomy with fusion and major depressive disorder.[81]  However, at step three, the ALJ found that none of Branch's impairments, either by themselves or in combination, met or medically equaled one of the listed impairments in the regulations.[82]

Prior to moving to step four, the ALJ determined Branch's residual functional capacity

---

[76]R. at 21.
[77]*See* 20 C.F.R. § 416.920(a).
[78]20 C.F.R. § 416.920(a)(4)(i)-(v).
[79]*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992).
[80]R. at 13.
[81]*Id.*
[82]R. at 13-14; *See* 20 C.F.R. 404, subpart P, Appendix 1, Regulations No. 4.

("RFC"). A claimant's RFC represents what work a claimant can perform despite his or her physical or mental limitations.[83] The ALJ made the following RFC determination for Branch:

> the claimant has the residual functional capacity to perform less than the full range of light work. The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; and sit at least 6 hours in an 8-hour workday, but needs to alternate sitting and standing at will. The claimant cannot climb ladders, ropes, or scaffolds; cannot work around hazards and cannot kneel, crouch, or crawl. The claimant can occasionally stoop and occasionally climb ramps/stairs. The claimant needs to use a hand-held assistive device for walking. She is limited to unskilled work that does not require interacting with the public.[84]

To her support her RFC with regard to physical limitations, the ALJ noted that the limitations found by the state agency consultants were supported by the medical evidence.[85] Further, the ALJ stated that there were no contrary opinions that found Branch required additional limitations.[86] However, the ALJ added the limitations that Branch needed a sit/stand option and needed a cane to walk.[87] The ALJ added these limitations because of Branch's consistent complaints of back pain "and giving some benefit of doubt to her testimony."[88]

In terms of Branch's mental limitations, the ALJ noted that Branch had undergone "very minimal" treatment for the alleged depression.[89] The ALJ conceded that Branch had displayed errors on mental status testing, but stated that these errors were due to her limited cooperation and effort rather than actual concentration or cognitive deficits.[90] However, the ALJ noted that Branch described "very limited activities" and concluded that Branch could only complete unskilled work because unskilled work requires little judgment to do simple tasks that can be learned on the job in

---

[83]20 C.F.R. §§ 416.920(e), 416.945.
[84]R. at 14-15.
[85]R. at 17-18.
[86]R. at 18.
[87]*Id.*
[88]*Id.*
[89]*Id.*
[90]*Id.*

a short period of time.[91]   The ALJ also observed that Branch was observed as angry and frustrated and, therefore, she should have limited contact with the public.[92]

In addressing Branch's subjective complaints, the ALJ stated that these complaints "could reasonably be expected to cause the alleged symptoms. However, [Branch's] statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible, given inconsistencies in the record overall."[93]

For support, the ALJ listed several inconsistencies.  For example, the ALJ stated that there were no medical opinions in the record that would support her alleged disability.[94]  She also found it significant that Branch underwent limited medical treatment following her surgery, with significant gaps between treatments.[95]  This suggested to the ALJ that the pain was not as severe as alleged.[96]  The ALJ also concluded that her medications –which included Tylenol 3 and ibuprofen – did not indicate incapacitating pain that high levels of narcotics would suggest.[97]

The ALJ also stated other "troubling" inconsistencies.[98]  For example, the disability report stated she worked as a hair dresser, but she insisted during her testimony that she never worked as a hair dresser.[99]   Further, an earnings report showed earnings from self employment; however, she stated that she has never been self employed.[100]   The ALJ found Branch's explanation – that someone used her Social Security Number – as "not very satisfactory."[101]   ALJ Ahmed also found

---

[91]*Id.*
[92]*Id.*
[93]R. at 15.
[94]R. at 18.
[95]*Id.*
[96]R. at 18-19.
[97]R. at 19.
[98]*Id.*
[99]*Id.*
[100]*Id.*
[101]*Id.*

Branch's description of minimal daily activities as inconsistent with previous statements to a therapist that she had to walk over one mile to attend the therapy session.[102]

Ultimately, the ALJ stated that the record did not provide strong objective support for Branch's allegations of extreme and incapacitating pain.[103] Specifically, the ALJ noted that since her surgery, Branch had few clinical examinations.[104] Further, the consultative examination showed, "minimal clinical abnormalities."[105] As for her left shoulder, the ALJ stated that the MRI showed minimal arthritis and no rotator cuff tear.[106]

With the RFC determined, the ALJ moved to step four where she concluded the Branch was not capable of completing past work.[107] However, at step five, the ALJ found that jobs existed in significant number in the national economy that Branch could perform.[108] Based on the VE's testimony that there were 5,200 jobs as a hand packer, 6,800 jobs as an assembler, and 4,200 jobs as a sorter, the ALJ concluded that there were a significant number of jobs in the economy that Branch could complete.[109] Therefore, ALJ Ahmed found Branch not disabled.[110]

## V.      Standard of Review

The District Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[111] The Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal

---

[102]*Id.*
[103]R. at 17.
[104]*Id.*
[105]*Id.*
[106]*Id.*
[107]R. at 19-20.
[108]R. at 20-21.
[109]R. at 20.
[110]R. at 21.
[111]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

error.[112]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate

finding as to disability.[113]  However, the ALJ must build an "accurate and logical bridge from the

evidence to [her] conclusions."[114]  While, the ALJ is not required to discuss every piece of evidence,

the ALJ must minimally articulate her reasons for crediting or discrediting evidence of disability.[115]

## VI.     Analysis

Branch raises the following three arguments in this judicial review: (1) the ALJ's RFC

finding failed to fully account for physical and mental limitations; (2) the ALJ's step five

determination that a significant number of jobs existed in the economy is erroneous; and (3) the

ALJ's credibility determination is based on mistaken reasoning.  We will discuss each of these

arguments in turn.

## A. RFC Determination

First, Branch takes issue with the ALJ's RFC finding.  Branch argues that ALJ Ahmed's

RFC finding failed to adequately account for both physical and mental limitations.

*1. Physical Limitations*

Branch argues that the ALJ adopted the state agency reviewing consultants' RFC findings

despite ninety-three pages of evidence submitted after those opinions were rendered.  Branch

contends that this additional evidence supports additional limitations. Specifically, Branch relies on

two MRIs. One showed "minimal arthritic change" in her left shoulder and another showed lumber

spondylolisthesis at L5-S1. Branch claims that the ALJ improperly "played doctor" by concluding

that the MRIs showed no evidence of further limitations beyond those already found by the state

---

[112]42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[113]*Cass v. Shalala,* 8 F. 3d 552, 555 (7th Cir. 1993).
[114]*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).
[115]*Clifford*, 227 F.3d at 870.

agency consultants. An ALJ is not permitted to "play doctor" or make independent medical conclusions.[116]  Instead, the ALJ must base her conclusions on the evidence.[117]

We do not agree that the ALJ made improper independent medical conclusions regarding Branch's physical limitations. With regard to the left shoulder MRI results, the ALJ stated in her opinion that the MRI showed "minimal arthritis."[118]  However, the MRI report itself stated that there was minimal arthritic change.[119]  It was not ALJ Ahmed's independent medical conclusion, as Branch contends, that Branch's shoulder condition was "minimal." Instead, the ALJ reiterated the medical conclusions made in the MRI report. The MRI also stated that there was no definitive rotator cuff tear.[120] Furthermore, we are not aware of, and Branch has not cited to, any evidence in the record that suggests that Branch had additional limitations because of problems with her left shoulder. Indeed, Branch did not even raise the left shoulder pain during her hearing. We note that it is the claimant's burden to demonstrate limitations resulting from alleged impairments.[121]

However, Branch seems to argue that the phrasing in the MRI report suggests that there might be a rotator cuff tear because the report stated that there was "no *definitive* rotator cuff tear."[122] Branch asserts that the ALJ should have investigated further. When evidence in the record is insufficient for the Social Security Administration to make a determination, the Social Security Administration must attempt to collect additional information from the claimant's treating doctors.[123] Also, the regulations state that a consultative examination will be ordered when there is insufficient

---

[116]*Clifford*, 227 F.3d at 870; *See also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003).
[117]*Craft v. Astrue*, 539 F.3d 668, 675–78 (7th Cir.2008); 20 CFR § 404.1527(c).
[118]R. at 17.
[119]R. at 472.
[120]*Id.*
[121]*See Clifford,* 227 F.3d at 868 (stating, "[t]he burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner").
[122]R. at 472 (emphasis added).
[123]20 CFR § 404.1512(e)(1).

evidence to make a determination.[124] Examples of circumstances where a consultative examination may be necessary include where the available evidence is conflicting, where the available evidence is highly technical, or where additional evidence needed is not contained in the record.[125] The fact that the MRI report stated that there was "no definitive" rotator cuff tear does not raise any ambiguity or suggest that additional evidence is needed. There is simply no evidence of a rotator cuff tear. Therefore, we conclude the ALJ's treatment of this MRI was appropriate.

With respect to the MRI report stating lumbar spondylolisthesis at L5-S1, we note that in her opinion, the ALJ found spondylolisthesis at L5-S1 to be a severe impairment.[126] Therefore, Branch's argument that the ALJ ignored this MRI is puzzling. The MRI confirmed what was known all along: Branch had lumbar spondylolisthesis at L5-S1. The MRI showed nothing new, and Branch does not explain how this MRI contradicts the RFC finding. Branch also argues that the ALJ made her own medical conclusion by stating that this MRI was "otherwise normal." But it was the MRI report that stated that Branch's lumbar area was "otherwise normal."[127] This was not the ALJ's own medical conclusion but a reiteration of the MRI report. Therefore, we find that the ALJ did not "play doctor" in this circumstance.

Morever, the ALJ ultimately added limitations to those found by the state agency reviewing physicians. Specifically, the ALJ added the sit-stand option and that Branch needed a cane for walking. The argument that the ALJ simply adopted the state agency opinions and ignored evidence submitted after those opinions were rendered is incorrect. Therefore, the ALJ's finding with regard to physical limitations is supported by substantial evidence, and we conclude that remand is not

---

[124]20 CFR § 416.919a.
[125]*Id.*
[126]R. at 13.
[127]R. at 519.

necessary on this issue.

*2. Mental Limitations*

As for Branch's mental limitations, Branch argues that the ALJ "played doctor" by drawing improper conclusions from Branch's limited treatment history and by incorrectly analyzing Dr. Bucur's opinion. Branch also generally argues the ALJ Ahmed's RFC determination fails to properly accommodate Branch's mental limitations.

First, Branch argues that the ALJ erroneously discounted the limitations caused by her depression because she did not have a long treatment history for her depression. The Seventh Circuit has noted that mental illness itself may prevent an individual from taking necessary medications or submitting to treatment.[128]

Here, the ALJ wrote, "[r]egarding the claimant's alleged depression, it is notable that she has had very minimal treatment for it."[129] The Commissioner contends that "[t]here is no criticism in that statement" and that the ALJ was simply restating a fact.[130] Such an argument is specious. It is clear to the Court that the ALJ was discounting the severity of Branch's depression based on the fact that she had minimal treatment.

The reasoning that Branch had a limited treatment history and, therefore, her depression was less severe is not the accurate and logical bridge that is required.[131] Instead, it was incumbent upon the ALJ to either acknowledge that Branch's mental illness may have prevented her from seeking

---

[128]*See Kangail v. Barnhart,* 454 F.3d 627, 630 (7th Cir. 2006).
[129]R. at 18.
[130]Def's brief at 9.
[131]*Id.* (finding that a similar reasoning did not "provide a rational basis for the denial of disability benefits to the plaintiff").

treatment,[132] or at least not use this fact to support the conclusion that Branch's depression was not as severe as alleged. It is worth noting that although Branch did not submit to much treatment for her depression, Edgewater treatment notes state that weekly therapy was prescribed.[133] Therefore, remand is necessary so that the ALJ may more fully articulate her reasoning on this issue.

Second, Branch asserts that the ALJ also played doctor by downgrading Dr. Bucur's findings because Dr. Bucur noted that Branch was not fully cooperative. Again, we agree with Branch. The ALJ noted that Branch displayed errors during Dr. Bucur's examinations, but the ALJ concluded that Branch did not suffer any limitations in maintaining concentration, persistence or pace, in part, because of Dr. Bucur's notation regarding Branch's cooperation and effort.

Although Dr. Bucur noted Branch's lack of cooperation, he ultimately found serious limitations. For example, he stated that Branch was "obviously quite depressed," and he assigned Branch a GAF of 50 – which indicates serious symptoms.[134] This GAF was supported by Edgewater treatment notes, which assigned Branch a GAF of 49.[135] As we have stated, the ALJ is not permitted to make her own independent medical conclusions.[136] However, that is exactly what the ALJ has done here: the ALJ altered or downgraded Dr. Bucur's ultimate conclusions based on observations that she was uncooperative.[137] Furthermore, we reiterate that mental illness may inhibit a patient from submitting to treatment.[138] Again, the ALJ should have considered the possibility that Branch's uncooperative nature was in fact a symptom of her mental illness. Therefore, we believe

---

[132]*Kangail v. Barnhart,* 454 F.3d 627, 630 (7th Cir. 2006) (remanding where the ALJ failed to consider the possibility that mental illness prevented that claimant from submitting to treatment).
[133]R. at 375-395.
[134]R. at 403.
[135]R. at 375-395.
[136]*Clifford*, 227 F.3d at 870
[137]*See Pancake v. AMAX Coal Co.,* 858 F.2d 1250, 1255 (7th Cir. 1988) (stating that the ALJ, "cannot substitute his expertise for that of a qualified physician.")
[138]*Kangail*, 454 F.3d at 630.

remand on this issue is necessary as well.

Third, Branch contends that the RFC does not properly account for her mental limitations. The ALJ found that Branch had moderate limitations of daily living and, therefore, limited Branch to unskilled work. The ALJ noted that unskilled work requires little judgment to do simple tasks that can be learned on the job in a short period of time. We fail to see the accurate and logical bridge from the evidence to the conclusion that Branch can complete unskilled work. Although the ALJ stated that unskilled work requires little judgment to do simple tasks, the ALJ did not make the connection, by citing to substantial evidence in the record, that such a limitation was sufficient to accommodate Branch, who was diagnosed with severe major depressive disorder. In fact, the ALJ did not cite to any evidence supporting the theory that she could complete unskilled work.

Likewise, the ALJ noted that Branch was observed to be angry and frustrated. The ALJ believed that limiting Branch's interaction with the public would sufficiently accommodate this problem. However, the ALJ cites to no evidence in the record that would support this conclusion. Perhaps, for example, Branch needs limited contact with co-workers as well.

As we have stated, Branch had a GAF score demonstrating severe symptoms. Also, the ALJ noted that Branch described very limited daily activities. Yet the ALJ does not sufficiently explain why the prescribed limitations are sufficient. Therefore, remand for further explanation is necessary on this issue as well. We note that consultation with a medical expert may help bolster the ALJ's conclusions.[139]

## B. Step Five Inquiry

Next, Branch contends that the ALJ's step five analysis is flawed for three reasons. First,

---

[139]20 C.F.R. § 404.1527(f)(2)(ii).

Branch asserts that the ALJ did not follow the proper procedures when referring to the DOT. Second, Branch claims the ALJ misstated the VE's testimony. And third, Branch argues that the ALJ presented the VE with hypothetical individuals that did not accurately reflect Branch's limitations.

Initially, Branch argues that the ALJ did not follow the proper procedures with regard to the DOT. Social Security Ruling 00-4p requires the ALJ to ask the VE whether his testimony conflicts with the DOT. Although the ALJ instructed the VE to notify her of any conflicts with the DOT before his testimony, Branch argues that this is insufficient. Branch argues that "an ALJ only may rest on a VE's testimony *after* a proper inquiry, which requires evidence about the requirements of the job by a VE and then an inquiry by the ALJ into any possible conflict."[140] For support Branch cites *Prochaska v. Barnhart*.[141] However, nowhere in *Prochaska*, or any case cited by Branch, does it state that the ALJ must inquire about conflicts *after* the VE's testimony. *Prochaska* states only that the ALJ cannot rely on the VE's testimony unless the ALJ makes the proper inquiry.[142] It makes no pronouncement about *when* that inquiry must be made. Moreover, as argued by the Commissioner, the VE alerted the ALJ to a conflict during his testimony and that conflict was resolved pursuant to the regulations.[143] In any event, the portion of the VE's testimony that conflicted with the DOT related to sedentary work, and the ALJ ultimately concluded that Branch was capable of completing more than sedentary work. Therefore, the ALJ did not rely on any testimony that conflicted with the DOT, and we do not find error here.

Branch raises a similarly technical argument that the ALJ failed to take administrative notice

---

[140]Plf's reply at 11 (emphasis in original).
[141] 454 F.3d 731, 735 (7th Cir. 2006).
[142]*Prochaska,* 454 F. 3d at 735.
[143]R. at 59; 20 C.F.R. § 404.1527(f)(2)(ii).

of the DOT.  For support, Branch relies on the regulations which state that the Social Security Administration will take judicial notice of materials like the DOT.[144]  But those regulations merely state that the Social Security Administration *can* notice of the DOT.  Despite Branch's argument, the regulations do not state that in order to use the DOT the ALJ must explicitly take notice of the DOT.  Moreover, the ALJ stated in her opinion that, "[t]he vocational expert indicated that his testimony is consistent with the information in the *Dictionary of Occupational Titles.*"[145]  The ALJ then states that her conclusion is based on the testimony of the VE.[146]  Therefore, the ALJ has made it sufficiently clear that she took administrative notice of the DOT.

Branch also argues that the ALJ misstated the VE's testimony.  Branch claims that according to the VE's testimony, the use of her cane precluded all occupations requiring bilateral use of the upper extremities.  Therefore, Branch asserts that because the ALJ included use of the cane in the RFC determination, she should have found that an insufficient number of jobs existed.

We do not agree that the ALJ misunderstood the VE's testimony.  After the VE stated that the jobs of hand packer, hand assembler, and hand sorter were available, the VE was asked if use of an ambulatory aid, for walking only, would change his response.[147]  The VE stated, "[i]t would not change my response."[148]  While the VE stated that use of a cane for standing would limit the number of jobs available, the ALJ ultimately concluded that a cane was needed for walking only – not for standing.[149]  Therefore, the ALJ's step five conclusion was consistent with the VE's testimony.

---

[144]20 C.F.R. § 404.1566.
[145]R. at 21.
[146]*Id.*
[147]R. at 57-59.
[148]*Id.*
[149]R. at 14-15.

Lastly, Branch argues that because the ALJ's RFC was incorrect, the ALJ failed to pose the correct hypothetical individuals to the VE. Branch argues that if the correct hypothetical individuals were posed to the VE, such as including concentration, persistence, and pace limitations, then it would be clear that Branch is disabled. According to Branch, the outcome is so clear that we should reverse and award benefits.

As we stated, *supra*, the reasoning the ALJ employed in reaching her RFC is flawed for several reasons. However, we do not conclude the RFC determination is necessarily inaccurate. At this time remand is necessary so that the ALJ can articulate her reasoning more clearly. If, upon remand, the ALJ finds that changes to the RFC are necessary, then further testimony from the VE may also be necessary.

## C. Credibility Determination

Finally, Branch argues that the ALJ's credibility determination is flawed. Branch contends that the ALJ failed to consider the entire administrative record when making her credibility determination. When determining credibility, "the ALJ must consider the entire case record and give specific reasons for the weight given to the individual's statements."[150] Furthermore, it must be clear to subsequent reviewers what weight the ALJ gave to the claimant's statements.[151]

Here, the ALJ stated that a general lack of objective medical evidence tended to undermine Branch's allegations. As we found earlier, the ALJ drew improper conclusions from the medical evidence. For example, we already determined that the ALJ put too much emphasis on Dr. Bucur's note that Branch did not cooperate. Therefore, the finding that the record lacked "objective" medical evidence to support Branch's allegations is tainted. Perhaps after reconsidering the evidence, the

[150]SSR 96-7p.
[151]*Id.*

ALJ will find more objective evidence for Branch's allegations. Therefore, we find the accurate and logical bridge connecting the evidence to the conclusion lacking here as well. The ALJ should revisit the credibility determination after the ALJ's own independent medical conclusions are removed.

**VII.     Conclusion**

For the reasons set forth above, Branch's motion for summary judgment is granted [dkt. 19] and the Commissioner's motion for summary judgment is denied [dkt. 24]. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED**.

**ENTERED: <u>September 29, 2011</u>**

                                   _____

                                   **UNITED STATES MAGISTRATE JUDGE**
                                   **Susan E. Cox**